Filed 6/18/26  In re J.S. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | E082686 |
| Plaintiff and Respondent, | (Super.Ct.No. J291455) |
| v. | OPINION |
| J.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Geraldine Willimas, Judge.  Affirmed in part; reversed and remanded in part with directions.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Anne Spitzberg, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

While on house arrest pending the disposition of a case involving robbery, burglary, and two aggravated assaults in San Bernardino County, J.S., was arrested for involvement in a murder in Los Angeles County, which involved two other individuals. After true findings were made by the juvenile court in Los Angeles County, J.S. was transferred to San Bernardino County Juvenile Court (S.B. Court) for the disposition hearing. He was committed to a secure youth training facility (SYTF) for an aggregate period of confinement of 18 years to life. He appealed.

On appeal, J.S. argues (1) the Los Angeles County Juvenile Court (L.A. Court) erred in making a true finding on the murder charge because it had "acquitted" J.S. on all valid theories of murder and misapplied the elements of aiding and abetting murder with implied malice; (2) in the alternative, the L.A. Court erred by failing to consider J.S.'s youth as a factor in considering whether J.S. acted with conscious disregard for the life of the victim; (3) the L.A. Court erred in admitting the out-of-court statements of a co-perpetrator to an undercover law enforcement officer pursuant to a "*Perkins* operation,"[1] violating J.S.'s confrontation rights; (4) insufficient evidence supports the S.B. Court true findings on robbery, burglary and two counts of aggravated assault; (5) recent statutory amendments require remand for a new disposition hearing as to the imposition of the restitution fund fine; and (6) J.S. requests that we review the sealed transcript of the proceedings conducted pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. We

---

[1] Referring to *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

2

reverse the adjudicatory finding on the L.A. Court murder petition, affirm the adjudicatory findings on the S.B. Court robbery and assault petition, and remand for further jurisdictional and dispositional proceedings.

## BACKGROUND

### A. *The Fontana Robbery Case, S.B. Court Case No. J291455*

On November 23, 2021, at approximately 10:23 p.m., three persons wearing ski masks and dark clothing entered a liquor store in Fontana, California. At the time, there was a customer in the store who was paying for purchases at the counter. Two of the masked persons approached the customer; one pointed a gun at the customer's head and pushed the customer to the end of the counter. The third suspect, described by the store clerk as the shortest suspect, pointed his gun at the clerk. The guns were all BB guns.

The suspect pointing the gun at the store clerk said something in Spanish, which the clerk did not understand. Then, in English, the suspect pointing the gun at the clerk demanded that the clerk give him all the money. The two other suspects who were with the customer demanded the customer's wallet, as the clerk was handing the customer $4 in change.

The store clerk put the $4 he had in his hand into the register and then removed bags of cash that had been stored under the register and threw them on the floor, without giving the suspect any money from the register. The suspect pointing the gun at the clerk demanded more money and did not take the bags that had been thrown. The suspect with the clerk then told the clerk not to do anything and shot the clerk twice in the face with a BB gun, resulting in injuries to the face as well as the hand that the clerk had used to try

3

to cover his face. This was when the customer turned and saw a gun pointed at his face. Then the short suspect who had shot at the store clerk left the store.

In the meantime, one of the armed suspects who was pointing a gun at the customer, demanded his wallet, but the customer did not want to give the wallet to the suspects. The customer removed cash from his wallet and handed it to the suspects, but the suspects demanded the wallet as well, as they pushed the customer back towards the wall where one of the suspects hit him in the head with a gun. The suspects snatched the wallet from the customer and ran away with the customer's money. The customer estimated he had approximately $3,000 in his wallet.

The store clerk then went to help the customer and the girl who worked with the clerk at the liquor store. The customer suffered an injury to his head that required three staples to close. When shown a video clip from the liquor store's surveillance system, the clerk was able to identify the shoes worn by the three suspects as they entered the store.

The Fontana Police Department investigated the robbery and obtained surveillance video from the liquor store as well as from the market directly across the street from the liquor store, and a nearby Motel 6. The video from the market across the street from the liquor store provided a view of the liquor store as well as the three suspects who approached the liquor store on the night of the robbery.

The surveillance video also showed a black Hyundai Veloster pulling into the parking lot of the market, located just south of the liquor store, and turning around to park, facing northeast, in the direction of the liquor store. The video clip then showed the three suspects exiting the liquor store, running southward. The vehicle then turned off its

headlights, exited the market's parking lot, and followed in the direction in which the three suspects had run.

A video clip from another camera showed that the vehicle then pulled into a parking lot on the west side of the liquor store, before pulling into the market parking lot across the street from the liquor store, where it was noticed that one of the fog lights in the front of the black Hyundai was not operational. From this angle, the three suspects could again be seen exiting the liquor store, running southward, followed shortly by the black Hyundai, with the headlights extinguished.

After observing the black Hyundai in the surveillance footage, Officer Adrian Garcia of the Fontana Police Department searched the vicinity the next day and found the suspect's vehicle, a black Hyundai, parked at a Motel 6, a short distance from the liquor store, where J.S. and a female had rented two rooms a few days earlier. Officers conducted surveillance at the Motel 6, where they observed four males come out of a motel room, get into the black Hyundai and drive away.

A patrol officer followed the black Hyundai in a marked patrol car, pulled the vehicle over, and detained the occupants. J.S. was the driver and wore a satchel that contained $7,072 in cash as well as two identification cards with his picture on them— one from El Salvador, bearing a birthdate indicating J.S. was an adult, and a California Identification Card indicating J.S. was a minor. The other three males in the car were Antonio Orellana (Orellana, occasionally misspelled as Orellano or Arellano), an adult, and two other minors.

5

Fontana Police Detective Christopher Romo, who had reviewed the surveillance video from the liquor store, contacted J.S., Orellano, and the other minors, at the time of their arrest, and observed that the shoes worn by each of the suspects in the liquor store matched the shoes worn by Orellano, and the other minors. Another police detective searched the two Motel 6 rooms where J.S., Orellano, and two other minors were staying at the time of the robbery. In one of those rooms, the detective found three BB guns, two black hoodie sweatshirts, two black Nike backpacks and some cell phones. In the other room, the detective found another fully automatic P1 BB gun, a bag of metallic BBs, a black hat, black pants, another black hoodie sweatshirt, and cell phones.

After J.S. was arrested, Fontana Police Detective Katie Beebe confirmed that the black Hyundai was registered to the address J.S. provided at the time of his booking. A search of the black Hyundai revealed a ski mask, white gloves, a black baseball hat, empty packaging for BB guns, a receipt from a sporting goods store showing the purchase of two BB guns, and BB gun pellets.

On November 30, 2021, a wardship petition pursuant to Welfare and Institutions Code section 602[2] was filed, alleging robbery (Pen. Code, § 211, count 1), two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1), counts 2 & 3), and one count of commercial burglary (Pen. Code, § 459, count 4), which offenses would be crimes if committed by an adult. J.S. was originally detained in juvenile hall but was released under the House Arrest Program on December 23, 2021, while the adjudicatory

---

[2] All further statutory references are to the Welfare and Institutions code unless otherwise indicated.

6

proceedings were in progress. On January 11, 2022, the juvenile court issued its ruling and found true all the counts of the petition. J.S. was continued detained in his father's home.

J.S. failed to appear for the disposition hearing on January 26, 2022, at which time minor's counsel informed the court that J.S. had been arrested and was detained in Los Angeles County. A bench warrant was issued for J.S.'s arrest.

B. *The Los Angeles County Murder Case, L.A. Court Case No. PJ53965-012722*

On January 17, 2022, Brian T. (the victim) left the residence where he lived with his father to meet Kathia Coreas for a prearranged meeting to engage in sex for money. The victim worked at the airport where his shift began at 1:00 a.m., so normally he would not go out in the evening. If he did go out, he would return home by 9:00 p.m. The victim took the van owned by his uncle when he left. However, he left his smartwatch behind, in his room.

When the victim did not return home at the expected hour, his father tried to call him, but the victim's cell phone was apparently turned off, which was unusual. The next morning, the victim still had not returned so his father reported him missing. When the father realized his son had not taken his watch with him, he contacted the victim's girlfriend, who provided the victim's password, allowing his father to see the text messages. Of note were text messages from one of the victim's contacts, Coreas, who

was listed either as "3rio" or "3 RIO" in the phone,[3] about meeting up in the Pacoima area of Los Angeles.

On January 19, 2022, at approximately 5:00 a.m., a man looking for illegally discarded mulch off an embankment on the north side of La Tuna Canyon in Los Angeles County, west of the 210 freeway's La Tuna Canyon exit, found the victim's body near the bottom of the embankment.[4]  An autopsy revealed that the victim had suffered two stab wounds on his left thigh, one of which transected the femoral artery, causing massive blood loss, resulting in his death.

1.  *Initial Investigation and Text Message Evidence of the "Set Up"*

Los Angeles Police Detective Sharon Kim, assigned to investigate the homicide, learned the victim's identity and, when the victim's name was run through the system, she learned that the victim's father had made a missing person report, so she went to speak with the father.  From the victim's father, the detective learned about the smartwatch and the text messages, which had caused the father to believe his son had gone to the Pacoima area of Los Angeles County to meet the individual listed as "3 Rio" in the victim's contacts.  The text messages were in Spanish, so the detective obtained a search warrant for the provider "Text Now," the service for the number associated with the text messages

---

[3] In other parts of the record, the contact is described as "Rio" by the detective, and the prosecutor referred to the contact as "Trio."

[4] The parties stipulated to facts related to the discovery of the victim's body, as well as the findings made, and photographs taken at the autopsy.  These facts were contained in a document that was admitted into evidence as Exhibit 1.

attributed to "Trio," or "3Rio" and obtained a log of all the text messages, which were then translated into English.

The text messages revealed that communication between Coreas, whose telephone number was the contact found on the victim's smartwatch, and the victim began in and around December 30, 2021, when Coreas was apparently looking for marijuana. On January 14, 2022, over the course of several text messages, Coreas informed the victim that she might let him do whatever he wanted if he gave her money.

Days later, Coreas provided the victim with an address on the northeast corner of Laurel Canyon where it intersected with Terra Bella, and informed the victim she would be at the gas station located there, reminding him to bring weed.[5] At the time, Coreas was living at an address adjacent to the gas station designated as the meeting spot with J.S., Orellana and Orellana's family. When the victim reached the address, Coreas asked him via text message what car he was in, and the victim replied that he was in a van.

Video surveillance recordings from the gas station located at the Laurel Canyon address as well as from a residence near the alley alongside the gas station that exits on to Pierce Street were obtained. The videos showed the path of the van as the victim approached the gas station, turning into the alley abutting the station, then showed Coreas

---

[5] In the exhibits, the calls and text messages were listed with times expressed in Universal Standard Time, so the times for the calls and text messages in Pacific Standard Time was calculated by deducting eight hours from the time expressed on the log.

approaching the van, at which point the van drove northbound into the alley.[6]  Minutes after Coreas entered the van, she sent a text message to Orellana.  The van was next seen going through the alley and turning to the right, heading eastbound on Pierce Street. Surveillance video from a residence on Pierce Street showed the van drive eastbound, and a few minutes later, the same video showed two males walking in the van's direction.

On January 19, 2022, Detective Kim arrived on the scene and found the victim's body laying over a railing down the embankment as reported by the bystander.

The victim's cause of death was a stab wound to his left lower extremity.  In total, there were three stab wounds, one of which was four inches deep and one and a half inches wide and transected the femoral artery on the left thigh region.  This was the fatal wound because it caused massive blood loss and unconsciousness within minutes. Another stab wound, just above the knee, was approximately two inches deep, and a third, incised wound was found on the victim's shin.

2. *Investigation Leading to the Arrests*

From the Text Now provider, the police obtained an email address and information relating to any phone numbers associated with the Gmail account, producing a telephone number with a (323) area code.  After obtaining a call log for that number, which pertained to a T-Mobile account on which Coreas was the subscriber, police officers obtained a call log for that number, from which investigators found two phone numbers

---

[6] The time stamp on the video was off by 15 minutes, reflecting 21:25, so the actual time of arrival at the gas station would have been 9:10 p.m.

10

for people of interest: one was the number for Antonio Orellana,[7] and that other was a number associated with J.S.

With this information, the investigators checked cell tower information and were able to map the phone locations using mapping software and were able to determine that Coreas' cell phone "mimicked" the place where the victim's body was found, and J.S.'s cell phone movements "mimicked" the same path.

On January 19, 2022, through the FBI license plate tracking system, Detective Kim was able to locate the victim's van within a mile of the gas station, where bloody fingerprints were found on the rear cargo door that matched J.S. The victim's van was found at a location matching the cell tower location of J.S.'s cell phone number, several hours after he appeared on the gas station video at 9:11 p.m.

3. *Coreas' Statements During the Perkins Operation*

Coreas was arrested and at some point placed in a holding cell with an undercover agent. While in the holding cell, two detectives observed as a *Perkins* operation was conducted, pursuant to the United States Supreme Court precedent holding that *Miranda* warnings (per *Miranda v. Arizona* (1966) 384 U.S. 436) are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement. (*Perkins*, *supra*, 496 U.S. at p. 294.)

In the recorded *Perkins* encounter, Coreas first discussed the robbery of the liquor store that was committed while she stayed in a motel, and for which her "brothers" were

---

[7] The record is unclear if Antonio Orellana was the same person as Antonio Arellano.

11

in jail. After some "stimulation," in the form of a mock wanted-poster displaying the photos of Coreas, Orellana and J.S., Coreas confessed the plan between herself, J.S., and Orellana was to rob the victim and, during the robbery, Coreas and Orellana stabbed the victim to death while J.S. "was driving" the victim's van. According to Coreas, the scam was a "set up."

Coreas admitted that she and Orellana were associates of the Mara Salvatrucha criminal street gang, also known as MS-13. Orellana's gang moniker is "Chaparro," while J.S.'s moniker is "Triste." A gang called "18th Street" is their primary rival. At the time of the murder, Coreas participated in a scam in which Coreas would lure men to meet her at a gas station, ostensibly to engage in sexual activity, and Coreas would tell them to be sure they brought "weed" and "get high" and "hot," at which point the two others working with Coreas would surprise the lured men and rob them. This was not the first time that the "set up" had been conducted.

Coreas also told the *Perkins* agent that on the night of the victim's murder, Coreas and the victim met at the gas station next to the Rincon Avenue residence (where Coreas resided at the time, and she got into the victim's van. Then Orellana and J.S. approached the van to "make it like a robbery." However, Coreas said that Orellana got angry when he saw the victim, because Orellana recognized the victim as a member of the rival gang, 18th Street. Then, when the victim panicked, Coreas admitted that she and Orellana stabbed the victim in his leg, each with a knife, in the van, killing him. Coreas indicated that J.S. only drove the van. There were no text messages between Coreas and J.S. about the meet-up between Coreas and the victim.

Then, Coreas told the *Perkins* agent that the three of them disposed of the victim's body down a ravine off the freeway. Thereafter, they cleaned the van with alcohol to remove any "proof," cut the carpet out, and left the van at another location approximately 10 to 11 streets down the road.

4. *Other Evidence and the Adjudication in Los Angeles*

Upon J.S.'s arrest, a "cellphone dump" was performed on J.S.'s phone, and a search warrant was executed respecting the accounts. This led to discovery that Google Pay account information had been entered on J.S.'s device after the victim went missing, which included two credit cards, one in the victim's name and the other in the victim's father's name.

A wardship petition was filed in the L.A. Court pursuant to section 602, charging J.S. with murder, pursuant to Penal Code section 187, subdivision (a), an act which would be a crime if committed by an adult. Following an adjudicatory hearing in the L.A. Court, the allegation was found true, the degree of the felony was deemed to be second degree, J.S. was found to be a resident of San Bernardino County, and the minor was transferred to S.B. Court for the disposition hearing. On October 16, 2023, the transfer in was accepted.

At the dispositional hearing, the S.B. Court declared J.S. to be a ward of the court, removed custody from his parents, and committed J.S. to a SYTF. The court found the most recent offense, second degree murder, was an offense described in section 707, subdivision (b), and determined the baseline term to be seven years. The court determined that the total aggregate maximum term under the two petitions is 18 years and

13

eight months to life, for which the probation officer recommended a baseline term of seven years, and which the court found to be appropriate.

The S.B. Court deferred the issue of victim restitution for a separate hearing but imposed a restitution fine in the amount of $100. Additional details of the disposition will be set forth in the discussion.

On November 30, 2023, J.S. timely appealed.

## DISCUSSION

1. ***Whether the L.A. Court Properly Found J.S. Had Aided and Abetted Implied Malice Murder***

J.S. raises several arguments challenging the finding that he aided and abetted murder with implied malice. On the day before oral argument was held in this case, the California Supreme Court issued its decision in *People v. Morris* (2026) 19 Cal.5th 671, 678 (*Morris*), holding that an aider and abettor of murder must actually aid and abet the lethal act in order to be convicted of murder. We requested briefing on this issue[8] and the parties have submitted supplemental briefs. Although *Morris* is distinguishable, we find its reasoning to be dispositive, so we need not reach J.S.'s specific claims of error respecting the trial court's reasoning, and we reverse the adjudicatory finding on the murder count.

---

[8] We also requested briefing on the impact, if any, of the recent decision in *People v. Zapata* (2026) 118 Cal.App.5th 529 (*Zapata*) on our analysis of the admissibility of Coreas's statements obtained during the *Perkins* operation.

a. *The L.A. Juvenile Court's Findings*

In reaching its conclusions, the L.A. Court discussed the various theories propounded by the People, noting that to be liable for an implied malice murder, a direct aider and abettor must, by words or conduct, aid the commission of the life endangering act, not the result of that act. The court treated the robbery as the life-endangering act that resulted in the victim's death. The court went on to state that the People have proved beyond a reasonable doubt that J.S. was an aider and abettor to the robbery with knowledge that his compatriots intended to commit the robbery; did, in fact, intend to aid the perpetrators in the commission of the robbery or attempted robbery, and had knowledge that the act was dangerous to human life.

The L.A. Court discussed case law relating to the People's alternative theories of liability, including the People's theory of implied malice murder, as well as decisional law pertaining to the People's need to prove whether the direct aider and abettor had knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and was acting in conscious disregard for human life.

Based on the circumstances of the robbery,[9] the L.A. Court found that J.S. was aware that he was engaging in conduct that endangered the life of another, thereby making him liable for second degree murder based on aiding and abetting of an implied

---

[9] The L.A. Court referred to the robbery as an "attempt" at various points, but the discovery of the credit cards belonging to the victim and his father in J.S.'s Google Pay account establishes that the robbery was fully consummated.

15

malice murder. The court also found, based on the circumstances of the attempted robbery, that J.S. engaged in conduct that endangered the life of another. It therefore concluded that J.S. was liable for second degree murder based on the aiding and abetting under an implied malice murder theory.

The L.A. Court added that it did not find "there to be the evidence of the aiding and abetting of the knifing itself. The evidence is just unclear as to this—[J.S.]'s participation in an act that is related to the knifing of the victim noting, as well in the statements that were admitted, that that was itself not planned."

b. *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

The same standard of review governs our review of the sufficiency of evidence in juvenile delinquency cases. (*In re Roderick P.* (1972) 7 Cal.3d 801, 809; *In re A.G.*

16

(2020) 58 Cal.App.5th 647, 653, citing *In re Matthew A.* (2008) 165 Cal.App.4th 537, 540.)

c. *General Legal Principles Respecting Aider and Abettor Liability for Implied Malice Murder*

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (Pen. Code, § 187, subd. (a).) An unlawful killing during the commission of a felony is also murder. (Pen. Code, § 189, subds. (a), (e).) Second degree implied malice murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder. (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) Malice may be express or implied. (Pen. Code, § 188, subd.(a).)

"Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'" [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Knoller*, *supra*, 41 Cal.4th at p. 143.) This definition is referred to as "simple implied malice murder." (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

"To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*Reyes*, *supra*, 14 Cal.5th at 989, quoting *Knoller*, *supra*, 41 Cal.4th at p. 152.) In *Knoller*, the court observed that two lines of

17

decisions had developed, " 'reflecting judicial attempts "to translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply." ' [Citations.] Under both lines of decisions, implied malice requires a defendant's awareness of the risk of death to another." (*Knoller*, at p. 152.)

" ' "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' " (*Reyes, supra*, 14 Cal.5th at p. 988.) "The question of implied malice is to be decided in light of all the circumstances." (*People v. Moore* (2010) 187 Cal.App.4th 937, 942.)

Under Penal Code section 187, the mens rea required for murder is malice aforethought. (Pen. Code, § 187, subd. (a); *People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) Regarding aiders and abettors, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (Pen. Code, § 188, subd. (a)(3); *People v. Harris* (2024) 105 Cal.App.5th 623, 631.) In the context of implied malice murder, "the aider and abettor must know the perpetrator intends to commit a life-endangering act, intend to aid the perpetrator in the commission of that act, know the act is dangerous to human life, and act in conscious disregard for human life." (*People v. Curiel* (2023) 15 Cal.5th 433, 468 (*Curiel*), citing *Reyes, supra*, 14 Cal.5th at p. 991.)

Murder also requires an actus reus. (*People v. Concha* (2009) 47 Cal.4th 653, 660.) As the Supreme Court reasoned in *Reyes*, " 'In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the

18

direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.' " (*Reyes*, *supra*, 14 Cal.5th at p. 991.)

Most recently, the California Supreme Court analyzed the requisite actus reus for an aider and abettor of a felony-murder in *Morris, supra*, 19 Cal.5th at page 678. The court began by noting that, "As relevant to this aider or abettor theory of liability, the amended felony-murder rule now states that when a person was not the actual killer, that person must have, 'with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.' ([Pen. Code,] § 189, subd. (e)(2).)" (*Id.* at p. *3.) Interpreting the language of the amended felony murder statute, the court concluded "that [Penal Code] section 189, subdivision (e)(2) requires a nonkiller to aid the actual killer in the lethal act." (*Id.* at p. *11].) While the language of Penal Code section 188, subdivision (a)(3), differs from section 189, subdivision (e), pursuant to section 188, subdivision (a)(3), a direct aider and abettor must act with malice aforethought, and act with intent to aid the life-endangering act of the direct perpetrator that proximately causes the death. (*People v. Pittman* (2023) 96 Cal.App.5th 400, 415 (*Pittman*), citing *Reyes*, *supra*, 14 Cal.5th at pp. 991-992.)

Implied malice murder "requires attention to the aider and abettor's mental state concerning the life endangering act committed by the direct perpetrator, such as shooting at the victim," or, as in this case, stabbing him. (*Reyes*, *supra*, 14 Cal.5th at p. 992.) In

other words, "the aider and abettor must know the perpetrator intends to commit a life-endangering act, intend to aid the perpetrator in the commission of that act, know the act is dangerous to human life, and act in conscious disregard for human life." (*Curiel*, *supra*, 15 Cal.5th at p. 468.) "Even if the act results in a death that is accidental, as defendant contends was the case here, the circumstances surrounding the act may evince implied malice." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 110 (*Nieto Benitez*).)

Thus, Senate Bill No. 1437 abolished the natural and probable consequences doctrine in cases of murder, amending section 188 to require that, when the felony-murder rule does not apply, a principal in the crime of murder "shall act with malice aforethought," and that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (See Stats. 2018, ch. 1015, § 2; *In re R.G.* (2019) 35 Cal.App.5th 141, 144.) As a result, the natural and probable consequences doctrine can no longer support a murder conviction. (*People v. Gentile* (2020) 10 Cal.5th 830, 847-848 (*Gentile*).)

Instead, "[w]ith the exception of [Penal Code] section 189, subdivision (e), 'a conviction for murder requires that a person act *with malice aforethought*' and that '[a] person's culpability for murder must be premised upon that person's *own actions and subjective mens rea*.' " (*People v. Lopez* (2026) 19 Cal.5th 639, 660-661.) We conclude the legislative language of Penal Code section 188, subdivision (a)(3) requires a finding that the accused actually aided the perpetrator in the commission of the life-endangering act, and that the accused's participation in a dangerous felony as an aider and abettor cannot form the basis for finding implied malice. Only in this way will a finding that the

20

accused aided and abetted in the commission of implied malice murder reflect a determination of the person's guilt based on his own actions and subjective intent.

The People argue in their supplemental letter brief that *Morris, supra*, 19 Cal.5th 671 does not apply in the present case, because J.S. was adjudicated on an implied malice second degree murder theory, not felony murder. We agree in part because *Morris* directly concerned interpretation of Penal Code section 189, subdivision (e)(2), respecting felony murder, and did not address principles of aiding and abetting as they apply to implied malice murder. However, in the present case, the juvenile court made the internally contradictory finding that J.S. was not liable under the felony murder theory, while it contemporaneously found that the life-endangering act attributable to J.S. for implied malice was the "act" of robbery, referring to his participation in a crime, now precluded by statute.

Liability for murder under a theory of implied malice requires that an aider and abettor *must aid in the commission of a life-endangering act*, with " ' "knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life." ' " (*Curiel, supra*, 15 Cal.5th at p. 463, citing *Reyes, supra*, 14 Cal.5th at p. 991.) "For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act." (*Reyes*, at p. 991.) To the extent that *Morris*, *supra*, 19 Cal.5th 671 interpreted Penal Code section 189, subdivision (e)(2), requiring for the actus reus that the aider and abettor aid the lethal act, cases interpreting the language of Penal Code section 188, subdivision (a)(3) compel similar

21

attention to accused's actual conduct and the requirement that the aider and abettor acted with malice aforethought.

In J.S.'s supplemental brief, no distinction is drawn between the theories of aiding and abetting second degree implied malice murder, on the one hand, and felony murder, on the other, although the elements to be established are different for each brand of murder or attempted murder. Nevertheless, he argues that the actus reus for implied malice second degree murder must be to directly aid the perpetrator in the commission of the lethal act. We agree only to the extent that a court must find the aider and abettor directly aided and abetted the life-endangering act, which cannot be based on the person's participation in a crime.

Our interpretation of Penal Code section 188, subdivision (a)(3) echoes the Supreme Court's focus in *Morris, supra*, 19 Cal.5th 671 on the actus reus of the aider and abettor in felony murder cases and causes us to conclude the juvenile court's finding that the life-endangering act was the robbery does not support a finding of implied malice murder as an aider and abettor after the abolishment of the natural and probable consequences doctrine. This is because, while we agree that *Morris* is not squarely on point with our analysis of the issue in the present case, its focus on the actus reus of the aider and abettor of felony murder is also reflected in the amendment to Penal Code section 188, subdivision (a)(3), defining implied malice, in terms that preclude a finding of implied malice "*based solely on his or her participation in a crime.*" (Pen. Code, § 188, subd. (a)(3); italics added.)

Given the eradication of the natural and probable consequences doctrine, we infer from the amendments to Penal Code sections 188 and 189, as well as from the holding in *Morris*, that for an aider and abettor to be liable for second degree implied malice murder, the accused must have directly aided and abetted the actual life-endangering act that caused the death, referred to as the "lethal act" in *Morris*, for purposes of felony-murder liability.

Here, the juvenile court's finding that J.S. committed a life-endangering act by participating in the robbery does not establish that he shared the killer's mental state vis-à-vis the killing that occurred during the robbery. Nor does anything in the record support a conclusion that J.S. aided in the actual life-endangering act, by either providing or using the knife, with the intent to aid the perpetrator in the commission of that act (the stabbing), with knowledge that the act is dangerous to human life. The juvenile court's finding that the robbery constituted the life-endangering act violates Penal Code section 188, subdivision (a)(3).

We therefore reverse the true finding on the L.A. Court murder petition and remand the matter for a new adjudicatory hearing.[10]

---

[10] In his supplemental letter brief, J.S. states an intent to preserve his right to confront and cross-examine any and all evidence derived from the judicially noticed case. However, this issue is more properly addressed to the juvenile court on remand.

d. *Analysis: Whether There Is Substantial Evidence to Support a Finding of Aiding and Abetting Implied Malice Second Degree Murder*

We need not address the specific claims of error raised by J.S. in challenging his adjudication on the murder allegation, including his claims that the juvenile court misunderstood the elements of the offense, because the juvenile court expressly found that J.S. did not aid or abet knifing itself. We have concluded that the Supreme Court's recent clarification of the actus reus for aiding and abetting felony murder in *Morris, supra*, 19 Cal.5th 671 has an analog in the amended provisions of Penal Code section 188, subdivision (a)(3), precluding a court from finding implied malice based on an aider and abettor's participation in a crime.

While the language is not identical to that of Penal Code section 189, subdivision (e), the main focus of Senate Bill No. 1437 was to ensure that a person's culpability for murder is premised upon that person's own actions and subjective mens rea. We therefore conclude that to be liable for implied malice second degree murder requires that the aider and abettor must directly aid in the life-endangering act. The trial court's finding that the life-endangering act was J.S.'s participation in the robbery conflicts with the express language of Penal Code section 188, subdivision (a)(3), and requires reversal.

We will remand the matter to the juvenile court for further proceedings and to permit the People to determine whether to proceed against J.S. on any other theory.

2. ***Whether, in the Alternative, the L.A. Court was Required to Consider J.S.'s Youth as a Factor in Considering Whether He Acted With Conscious Disregard for the Life of the Victim for Second Degree Murder***

In an alternative challenge to the finding that J.S. was liable for second degree implied malice murder, J.S. argues the true finding must be reversed because J.S.'s youth was not considered by the juvenile court, relying on *People v. Pittman*, *supra*, 96 Cal.App.5th 400, a decision out of the First District Court of Appeal involving a petition for resentencing under Penal Code section 1172.6. Specifically, J.S. argues that remand is required because *Pittman* established new law requiring a court to consider factors relating to youth in determining if the element of conscious disregard for the risk to life was met for purposes of second degree implied malice murder. We disagree.

Decisional law recognized the differences in culpabilities between adults and youths long before the *Pittman* decision issued. (See *Graham v. Florida* (2010) 560 U.S. 48, 68, citing *Roper v. Simmons* (2005) 543 U.S. 551, 569.) Therefore, even before *Pittman*, youthful offender factors were required to be considered to ensure proportionality of punishing juvenile offenders. (See *Miller v. Alabama* (2012) 567 U.S. 460, 471-480; see *People v. Franklin* (2016) 63 Cal.4th 261, 286-287 (*Franklin*).)

But even *Pittman* does not hold that youth factors are required to be considered in adjudicating a minor (i.e., a youth) of a crime in juvenile court, the forum for youths. Instead, *Pittman* considered a resentencing petition of a person found guilty as an adult of implied malice murder as an aider and abettor. Likening the finding of reckless indifference to human life (required for an aider and abettor of felony murder) to the

25

conscious disregard for human life required for implied malice, the court of appeal in *Pittman* held that there was no reason not to apply the principle articulated in the felony-murder cases to the implied malice finding for second degree murder. (*Pittman*, *supra*, 96 Cal.App.5th at pp. 416-417.)

J.S.'s reliance on the *Pittman* case is misplaced. Nowhere in the decision does the reviewing court state that youth factors must be considered before a juvenile may be found liable for second degree murder in juvenile court. Nor does the decision hold that youth factors must be considered as an element of, or an affirmative defense to, implied malice second degree murder. Instead, for persons convicted before the legislative amendments, the *Pittman* court determined that the defendant's youth was a factor for the court to consider at his resentencing hearing, and remanded the matter for the court to consider how, if at all, the defendant's youth impacted his ability to form the requisite mental state for second degree murder for purposes of determining if he had reckless indifference to human life, where it had not been considered previously in the course of his conviction as an adult. (*Pittman*, *supra*, 96 Cal.App.5th at p. 418.)

Penal Code section 1172.6 offers resentencing for petitioners who have not been determined beyond a reasonable doubt to have the degree of culpability now required for a murder, attempted murder, or manslaughter conviction. (*People v. Strong* (2022) 13 Cal.5th 698, 703, 720.) However, a Penal Code section 1172.6 resentencing proceeding "merely considers whether the defendant's request for leniency meets the necessary criteria." *(People v. Schell* (2022) 84 Cal.App.5th 437, 444-445.) The amendments enacted pursuant to Senate Bill No. 1437 did not alter the elements of

second degree implied malice murder or modify the definition of implied malice, and *Pittman* does not so hold.

To the extent that the *Pittman* decision noted a similarity regarding between the element of reckless indifference to human life (necessary for a conviction of murder under the felony-murder theory) and the element of conscious disregard of the risk to life (required for second degree implied malice murder), it did not add any elements to the crime of second degree murder. Moreover, as a juvenile, J.S. was not "sentenced" for murder as an adult would be. Notwithstanding the maximum confinement time stated in the disposition imposed by the juvenile court, J.S.'s commitment to the SYTF will end when J.S. is 25 years old. (See § 875, subd. (c)(1)(A).)

We acknowledge that factors relating to youth are relevant to many sentencing hearings of young adults (Cal. Rules of Court, rule 4.420(a) [where a court is required to select a determinate term based on factors in aggravation or mitigation]), and to all juvenile dispositional proceedings. (Cal. Rules of Court, rules 4.423(b), 5.804(a).) They are also relevant for parole hearings for juveniles tried as adults and sentenced to an indeterminate term, or a term of life without possibility of parole (Pen. Code, §§ 1170, subd. (d), 3046, 3051; *Franklin*, *supra*, 63 Cal.4th at pp. 283-284), and to *resentencing* decisions. (See *People v. Rodriguez* (2018) 4 Cal.5th 1123, 1132.)

However, no cases—*Pittman* included—have applied this policy to *guilt* findings in adult court, as an element of, or affirmative defense to, second degree murder. More significantly, the reasoning of *Pittman* has no application to *adjudications* in the juvenile court, where youth permeates all the proceedings. Further, respecting J.S.'s argument

27

that *Pittman* is new law that is binding on us, we must point out that " ' "[a] decision of a court of appeal is not binding in the courts of appeal." ' " (*People v. Lara* (2025) 108 Cal.App.5th 1005, 1024, fn. 8.)  That distinction lies with the Supreme Court.

At the disposition hearing, the juvenile court stated it considered J.S.'s age, and other youth related factors set forth in California Rules of Court, rule 5.804 in arriving at its commitment decision, so the juvenile court properly considered his youth.  Nothing more was required under current law.

### 3. *Admissibility of Coreas' Out-Of-Court Statements Made During a Perkins Operation, and Text Messages Between Coreas and the Victim*

J.S. argues that the court committed reversible error in admitting Coreas's out-of-court statements to an undercover operative during the operation conducted pursuant to *Perkins*, *supra*, 496 U.S. 292, as well as admitting the text messages exchanged by Coreas and the victim, on the grounds the statements were inadmissible testimonial hearsay admitted in violation of J.S.'s confrontation rights, that no hearsay exceptions applied to the statements and text messages made by Coreas, and that the statements made by Coreas were obtained during a custodial interrogation, directed by a police officer, and should have been stricken pursuant to the Sixth Amendment.  We requested that the parties submit supplemental briefs on the applicability and effect of the recent decision in *Zapata, supra*, 118 Cal.App.5th 529 to the issues relating to the *Perkins* operation.  We disagree with J.S.'s assertions respecting the admissibility *vel non* of the Coreas's out-of-court statements and the text messages.

a. *Admissibility of Coreas' Statements to the Undercover Operative*

The People sought admission of Coreas' statements made while detained in a holding cell to an undercover operative, described in the motion in limine as a third party civilian, but who was believed to be an undercover police officer by one of the detectives participating in the operation. During the time spent in the holding cell, Coreas made many statements, admitting that she, Orellana and J.S. were operating a scam or "set-up," in which men would be lured to the gas station at the corner of Laurel Canyon and Terra Bella, to be robbed. Coreas described herself, Orellana and J.S. as affiliates of the Mara Salvatrucha gang (MS-13).

Coreas was called as a witness, but she invoked her right to remain silent at the time of J.S.'s trial, and was therefore found to be unavailable as a witness. During in limine proceedings, the court conducted Evidence Code section 402 hearing respecting the admissibility of the statements made by Coreas, at which time the juvenile court ruled the statements were not testimonial. At the conclusion of the evidence, the court revisited that ruling and reaffirmed its ruling on the admissibility of the statements made during the *Perkins* operation because they showed a conspiracy.

(i) *Standards of Review and Prejudice*

"We review a trial court's ruling on the admissibility of evidence for abuse of discretion." (*People v. Ng* (2022) 13 Cal.5th 448, 540, citing *People v. Waidla* (2000) 22 Cal.4th 690, 725.) Where evidence is erroneously admitted as a matter of state law, the test for harmless error is set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) "However, if the improperly admitted hearsay is also testimonial within the

29

meaning of the high court's confrontation clause jurisprudence [citation], the error is assessed under the federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, 24, which requires any error to be harmless beyond a reasonable doubt." (*People v. Valencia* (2021) 11 Cal.5th 818, 840 (*Valencia*).)

> (ii) *Testimonial Hearsay*

J.S. argues on appeal, as he argued in the juvenile court, that admission of Coreas' statements of the undercover operative was erroneous because the statements constituted testimonial hearsay. We disagree.

In *Crawford v. Washington* (2004) 541 U.S. 36, 68 (*Crawford*), the United States Supreme Court held that the confrontation clause of the federal Constitution generally bars the admission of "testimonial" hearsay when offered by the prosecution against a criminal defendant without a showing of witness "unavailability and a prior opportunity for cross-examination." (See *Valencia*, *supra*, 11 Cal.5th at p. 830.)

To determine the admissibility of out-of-court statements, courts "engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out-of-court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*People v. Sanchez* (2016) 63 Cal.4th 665, 680.)

In attempting to explain the term, *Crawford* stated that "testimonial hearsay" "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Crawford*, *supra*, 541 U.S., at p. 68.)

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822, (*Davis*).)

"Although *Crawford* and its progeny have 'not settled on a clear definition of what makes a statement testimonial, [our state Supreme Court has] discerned two requirements. First, "the out-of-court statement must have been made with some degree of formality or solemnity." [Citation.] Second, the primary purpose of the statement must "pertain[] in some fashion to a criminal prosecution." ' " (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 66.) *Crawford* also emphasized that statements made without the "'solemn[ity]'" and "'purpose'" characteristic of "testimony," are not the concern of the confrontation clause. (*Crawford*, *supra*, 541 U.S. at p. 51; see *People v. Cage* (2007) 40 Cal.4th 965, 991 (*Cage*).)

The United States Supreme Court has emphasized that determining whether a statement is testimonial "requires a combined inquiry that accounts for both the declarant and the interrogator." (*Michigan v. Bryant* (2011) 562 U.S. 344, 367; see *Cage*, *supra*, 40

Cal.4th at p. 984 [testimonial statements are those "given and taken" for the primary purpose of "prov[ing] some past fact for possible use in a criminal trial"].)

"The high court has yet to state definitively just *what* facts conclusively demonstrate that particular hearsay qualifies as testimonial. [Citation.] However, it has never held a hearsay statement to be testimonial unless it was sufficiently formal and made by or to a government agent during the course of a criminal investigation, for the primary purpose of preserving evidence for trial]." (*People v. Ramirez* (2022) 13 Cal.5th 997, 1147.)

Thus, "statements made unwittingly to a Government informant" and "statements from one prisoner to another" are nontestimonial statements. (*Davis*, *supra*, 547 U.S. at p. 825, citing *Bourjaily v. United States* (1987) 483 U.S. 171, 181-184; see *People v. Almeda* (2018) 19 Cal.App.5th 346, 362-363.) Statements made during a *Perkins* operation qualify as statements made unwittingly to a government informant and are therefore nontestimonial. (*People v. Fayed* (2020) 9 Cal.5th 147, 165 [where no prior invocation is in effect, conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*].)

In arguing that Coreas' statements were made in response to a police-led, custodial examination, conducted in a holding tank, J.S. refers us to *People v. Dalton* (2019) 7 Cal.5th 166, 219. In *Dalton*, the California Supreme Court held that the statements of a government informant were nontestimonial, but the court agreed the statements were inadmissible on an alternative ground as unreliable hearsay. There, the jail informant had numerous convictions which undermined his reliability, and the statements "'were not

made to law enforcement officers, nor were they otherwise made under circumstances suggesting a primary purpose of creating evidence"' for the prosecution. (*Id.* at p. 209, citing *People v. Rangel* (2016) 62 Cal.4th 1192, 1217.) The decision in *Dalton* does not support J.S.'s premise.

Because "statements made unwittingly to a Government informant" are "clearly nontestimonial" (*Davis, supra*, 547 U.S. at p. 825), they are admissible, unless there is another basis for exclusion. Coreas's statements, obtained during the *Perkins* operation, were not inadmissible as testimonial hearsay.

(iii) *Admissibility of Coreas's Statements Made During the Perkins Operation as Custodial Interrogation*

J.S. also argued in his opening brief that Coreas' statements were inadmissible because they were made in response to a police-led, custodial examination, conducted in a holding tank.

During oral argument, our attention was drawn to the recent decision in *Zapata, supra*, 118 Cal.App.5th 529, addressing the admissibility of statements obtained during a *Perkins* operation in which the defendant had requested counsel. We requested the parties to address this issue in supplemental letter briefs, which we have now reviewed. J.S. argues that the holding of *Zapata* applies here and indicates it pertains to the arguments posed in his opening brief and requires reversal of the judgment.

The People argue that the facts of *Zapata* are distinguishable, and that J.S. forfeited any claim regarding the admissibility of Coreas's statements during the *Perkins*

33

operation on *Miranda* grounds because he failed to object on those grounds at the adjudication hearing.  We agree with the People on both points.

(a) *Forfeiture*

Under the general forfeiture doctrine, a reviewing court will ordinarily not consider procedural defects or erroneous rulings where an objection could have been, but was not, presented to the lower court by some appropriate method.  (*People v. Espiritu* (2026) 119 Cal.App.5th 1128, 1137, quoting *People v. Saunders* (1993) 5 Cal.4th 580, 589-590.)  However, an appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party.  (*In re T.F.* (2017) 16 Cal.App.5th 202, 213; *People v. Johnson* (2004) 119 Cal.App.4th 976, 984.)  We therefore address the issue.

(b) *Whether Miranda Considerations Rendered Inadmissible the Statements Obtained During the Perkins Operation*

We have already discussed the general principles governing the admissibility of statements obtained during a *Perkins* operation in the context of J.S.'s argument that the statements constituted testimonial hearsay and need not repeat them.  The next question is whether those statements were obtained in violation of Coreas's *Miranda* rights such that the admission of those statements in J.S.' adjudicatory hearing violated J.S.'s right to a fair trial.  We answer this question in the negative.

" '[D]efendants generally lack standing to complain that a police interrogation violated a third party witness's Fifth Amendment privilege against self-incrimination or Sixth Amendment right to counsel … .  [Citation.]  A defendant may assert a violation of

his or her own right to due process of the law and a fair trial based upon third party witness coercion, however, if the defendant can establish that *trial* evidence was coerced or rendered unreliable by prior coercion and that the admission of this evidence would deprive the defendant of a fair trial.' [Citation.] 'The burden rests upon the defendant to demonstrate how the earlier coercion "directly impaired the free and voluntary nature of the anticipated testimony in the trial itself" [citation] and impaired the reliability of the trial testimony.' " (*People v. Wilson* (2024) 16 Cal.5th 874, 918.)

Recently, our sister court has held that there are situations in which statements obtained during a *Perkins* operation may implicate a defendant's constitutional rights such that admission of the statements under the authority of *Perkins* is deemed to be prejudicial error. (*Zapata, supra*, 118 Cal.App.5th at p. 541.) But *Zapata* is distinguishable.

In *Zapata*, the Division One of the Fourth District Court of Appeal noted there were variations on the "*Perkins* Operation," in which officers interact with the suspect during the operation to pressure the suspect, or use other means to "stimulate" conversation between the suspect and the *Perkins* agent. (*Zapata, supra*, 118 Cal.App.5th at p. 540.) It noted that " '[p]loys to mislead a suspect or lull him into a false sense of security *that do not rise to the level of compulsion or coercion to speak* are not within *Miranda's* concern,' " while "ploys which rise to the level of compulsion or coercion *remain* within *Miranda's* ambit." (*Ibid*., citing *Perkins, supra*, 496 U.S. at p. 297.)

Multiple variations had been employed on *Zapata*, where a deputy contacted Zapata several times in the cell to remind him that law enforcement was there and to get him to talk, culminating in a line-up ruse which created sufficient anxiety to cause Zapata to request an attorney before he was returned to his cell. After his return to the cell, increased pressure was applied, leading to his statements admitting the crime when the officer told Zapata he would be charged with murder. (*Zapata, supra*, 118 Cal.App.5th at p. 541.) There, the court noted that the officer's recurring presence were the type of " 'further police-initiated custodial interrogation' " prohibited under *Edwards v. Arizona* (1981) 451 U.S. 477, 486-487 (*Edwards*) [holding that, having requested counsel, the defendant could not be subjected to further communication with police], rendering Zapata's self-incriminatory statements inadmissible. (*Zapata*, at p. 541, citing *Edwards, supra*, at pp. 484-485.)

The *Zapata* case is distinguishable from this case on multiple bases: (1) the defendant in *Zapata* was the person who was the target of the *Perkins* operation rather than a co-perpetrator or other third party, (2) the stimulating tactics involved the recurring presence of law enforcement in the cell and escalating tactics to elicit incriminating statements, and (3) the defendant (*Zapata*) had invoked his right to counsel prior to the elicitation of the incriminating statements. Additionally, in *Zapata*, the issue was properly preserved for appellate review by a timely objection to admission of the statements in the trial court on the same ground.

The reviewing court acknowledged that " '*Miranda*'s rule has a limit: It only applies when the suspect-defendant was the subject of "custodial interrogation" ' because

36

those circumstances ' "contain[] inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so." ' " (*Zapata, supra*, 118 Cal.App.5th at p. 538.)

In other words, the problem that led to the reversal of the conviction in *Zapata* was not simply that the defendant made incriminating statements during a *Perkins* operation, because such statements have been held to be admissible by the United States Supreme Court. As an intermediate appellate court we lack authority to reverse a rule established by the United States Supreme Court: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls … ." (*Rodriguez de Quijas v. Shearson/American Express, Inc.* (1989) 490 U.S. 477, 484.) Absent extraordinary circumstances we are bound to follow *Perkins*.

What *Zapata* appears to hold is that where a *Perkins* operation takes on the aspects of a custodial interrogation due to the recurring presence of investigating officers and the extreme nature of the "stimulation," and where the suspect has invoked his right to counsel, the *Perkins* operation takes on the aspect of a custodial interrogation and the admission of the defendant's statements may violate his constitutional rights to remain silent and to counsel.

The *Zapata* decision does not lend much to our analysis in the present case because J.S. was not the person subjected to the *Perkins* operation, so his own statements were not introduced against him in violation of his constitutional rights. Additionally, there is no evidence that Coreas was coerced or that she invoked her *Miranda* rights or

that there was a recurring presence of officers in the cell which might transform the *Perkins* operation into a custodial interrogation.

Instead, the statements made by Coreas fall into the class of statements made unwittingly to a government agent. The *Perkins* operation was neither formal nor solemn, and there is no indication in the record that Coreas was objectively aware the statements might be used against her or that she had invoked either her right to remain silent or her right to counsel, which was ignored. Coreas believed that the undercover officer was a fellow detainee, and she made the statements despite her reasonable expectation that the statements might be secretly recorded. The nontestimonial statements presented no violation of J.S.'s right of confrontation and were therefore admissible.

J.S. also argues that "[t]o the extent the record shows [Coreas] was acting as an *un*reasonable person, then the exclusion of the statements was all the more necessary," referring to *People v. Leach* (1975) 15 Cal.3d 419, 441, as legal support. That case, however, was concerned with the policies surrounding the admissibility of statements of coconspirators and the wisdom of requiring independent proof of a conspiracy, before admitting a coconspirator's statement. The policy does not govern our review of the juvenile court's determination that the statements made by Coreas during the *Perkins* operation were not testimonial hearsay. Nor does the policy require us to determine whether the declarant was acting as an unreasonable person when considering admissibility of statements made during a *Perkins* operation. We now address the admissibility of the statements as those made by a coconspirator separately, below.

38

(iv) *Alternative Challenges to the Admission of Evidence of the Perkins*

*Operation*

J.S. argues that even if the statements by Coreas during the *Perkins* operation did not implicate the Confrontation Clause, either some or all the statements were inadmissible hearsay and were admitted in violation of J.S.'s statutory and due process rights. The trial court ruled in limine that the statements were admissible as statements against Coreas' penal interest and overruled the objection. Because J.S. proffered no other objections in the juvenile court, we limit our review to the hearsay objections preserved in the juvenile court.

Hearsay statements are generally inadmissible as evidence (Evid. Code, § 1200, subd. (b)), but California law recognizes several exceptions to this rule. One such exception allows the admission of any statement that "when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230; *People v. Jasso* (2025) 17 Cal.5th 646, 668.)

The policy underlying this exception is recognition that "'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,'" and "mitigate[es] the dangers usually associated with the admission of out-of-court statements." (*People v. Grimes* (2016) 1 Cal.5th 698,

711 (*Grimes*), quoting *People v. Spriggs* (1964) 60 Cal.2d 868, 874.) To establish that an out of court statement is admissible as a declaration against interest, " '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' [Citation.] 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*Grimes*, *supra*, at p. 711.)

We review a trial court's decision for abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 153.)

In the present case, Coreas was unavailable because she invoked her Fifth Amendment guaranty to not be forced to testify against herself. (See Evid. Code, §§ 240, 1291; *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 263, citing *People v. Butler* (2009) 46 Cal.4th 847, 866, fn. 9.) This satisfied the first element for admission of a statement against her penal interests. (Evid. Code, § 1230.)

Coreas' statements were most certainly against her own penal interest, given that she described her participation in the ruse employed to lure the victim to the meet-up location, admitted the plan to rob the victim and then admitted she stabbed the victim. Admissions do not get much more self-incriminating than this. The fact Coreas implicated Orellana and J.S. does not change the nature of her statements or affect the

40

admissibility of the statements, where she expressed out loud that if the other gang members (the victim's gang) learned she had made the statements, she would be killed. The reliability factor was therefore established. The statements produced during the *Perkins* operation were admissible as statements against Coreas's penal interests.

Regarding the effect Coreas' statements had in incriminating J.S., we note that currently, "the Sixth Amendment protections under the *Aranda-Bruton* doctrine [referring to *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123], whatever their reach before, are confined to testimonial statements now." (*People v. Tran* (2022) 13 Cal.5th 1169, 1195.) We previously concluded that statements in question were not testimonial, and, absent an objection on this ground to preserve this issue in the juvenile court, we have confined our review accordingly.

Because the statements were not testimonial, the fact that some of the statements explained the roles played by Orellana and J.S. does not compel their exclusion. There was no abuse of discretion.

b. *Admissibility of the Text Messages as Statements of a Coconspirator*

i. *Additional Background*

In the juvenile court, in limine motions were brought both by the People and by J.S. Respecting certain text messages found on the victim's Apple watch, the People sought admission of the text messages as statements of a coconspirator. The People's theory was that the text messages evidenced the "set up" by which the victim was lured to a gas station on the promise of sex for money and were admissible as statements of a coconspirator. The People also sought admission of the text messages on the ground they

were offered for a nonhearsay purpose as circumstantial evidence of the group's plan of luring the victim to the location in order to rob him taking effect.

J.S. objected to the admission of text messages exchanged between Coreas on the ground they were hearsay, not subject to any exception to the hearsay rule. The trial court ruled that the text messages showed a conspiracy and that the statements were admissible as statements of a coconspirator in furtherance of the conspiracy, assuming that evidence of the conspiracy were actually offered. J.S.'s counsel indicated she would reiterate the objection during the testimony if the foundation were not met.

During the adjudicatory hearing, Detective Kim testified that the victim's father provided her with the victim's Apple watch with the text messages. The victim's father told the detective that the text messages caused him to believe the victim had gone to Pacoima with an individual identified in the messages as "Rio" or "Trio" or "3Rio." The detective obtained the telephone number for the contact identified as "3 Rio" or "Trio" and then obtained a search warrant which yielded a log of text messages. The messages were in Spanish, so an interpreter provided translation. The detective then testified to the contents of the text messages without further objection to the admissibility until after the evidentiary portion of the hearing had ended.

At that point, J.S.'s counsel argued there was no evidence of a conspiracy, so the statements were purely hearsay. The court overruled the hearsay objection on the ground the statements were not offered for the truth of the matter, and that the statements were used to show the subsequent actions and operative facts of the subsequent action of the victim coming to the location, and the existence of the conversation between Coreas and

42

the victim.  The court also indicated that a conspiracy had been shown by a preponderance of the evidence, so to the extent any statements were offered for the truth of the matter, they were admissible under the hearsay exception for statements of a coconspirator.

On appeal, J.S. argues the juvenile court erred because the text messages did not fall within an exception to the hearsay rule.  We disagree.

ii.  *General Legal Principles Governing Hearsay, Nonhearsay, and the Coconspirator Exception to Hearsay*

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated"; hearsay evidence is inadmissible.  (Evid. Code, § 1200, subds. (a), (b).) However, in addition to identifying a nonhearsay purpose for admitting the statement, a trial court must also find that the nonhearsay purpose is relevant to an issue in dispute. (*People v. Mataele* (2022) 13 Cal.5th 372, 413, citing *People v. Armendariz* (1984) 37 Cal.3d 573, 585; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1204-1205.)

"[E]vidence of a declarant's statement that is offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief," is not hearsay, "since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement."  (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162 (*Livingston*), citing *People v. Scalzi* (1981) 126 Cal.App.3d 901, 907.)  To be admissible for this nonhearsay purpose, the hearer's motive, state of mind or intent, must be

43

independently relevant without regard to the truthfulness of those statements. (*People v. Gobert* (2023) 89 Cal.App.5th 676, 684.)

"'A determination of relevance and undue prejudice lies within the discretion of the trial court, and a reviewing court reviews that determination for abuse of discretion."' (*Livingston*, *supra*, 53 Cal.4th at p. 1162; *People v. Smith* (2003) 30 Cal.4th 581, 612.)

An exception to the hearsay rule permits admission of statements by a coconspirator. Evidence Code section 1223 provides, a hearsay "statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

For hearsay statements by coconspirators to be admissible against a party, "at the threshold, the offering party presents 'independent evidence to establish prima facie the existence of … [a] conspiracy.'" (*People v. Thompson* (2016) 1 Cal.5th 1043, 1108 (*Thompson*), citing *People v. Hardy* (1992) 2 Cal.4th 86, 139.)

"Pursuant to Evidence Code section 1223, '[o]nce independent proof of a conspiracy has been shown, three preliminary facts must be established: "(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time

of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy." ' " (*Thompson*, *supra*, 1 Cal.5th 1043, 1108.)

"Evidence of an uncharged conspiracy may be used 'to prove criminal liability for acts of a coconspirator.' [Citations.] Under an uncharged conspiracy theory, ' " '[e]ach member of the conspiracy is liable for the acts of any of the others in carrying out the c*ommon* purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design.' " ' " (*People v. Virgen* (2025) 110 Cal.App.5th 440, 451.)

Stated another way, "[c]oconspirators' hearsay statements may be admitted if there is independent evidence of a conspiracy and the party seeking to admit the hearsay shows the speaker was involved in the conspiracy when the hearsay statement was made, the statement was made in furtherance of the conspiracy, and the person against whom the statement is being offered either was participating in, or later would participate in, the conspiracy." (*People v. Hoyt* (2020) 8 Cal.5th 892, 924.)

We review claims of erroneous admission of evidence under the standard of review for claims of state law error. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 76, referring to *Watson*, *supra*, 46 Cal.2d at p. 836 [standard of prejudice].)

The text messages were admissible as nonhearsay, because they showed the effect of Coreas' messages to the victim on his subsequent actions, even before the conspiracy was established. At the point at which the text messages were received in evidence, the statements obtained during the *Perkins* operation had not yet been admitted, so the method of operation used by the coconspirators and Coreas' statement of the goal of their operation had not been independently established.

45

Nevertheless, Evidence Code section 1223 takes into account the court's discretion in setting the order of proof. (Evid. Code, § 1223, subd.(c).) By the time of the close of evidence, the statements made by Coreas during the *Perkins* operation had been admitted, constituting independent evidence of the conspiracy. The evidence demonstrated the conspiracy involved a "set up," and a "meet up" at which Orellana and J.S. would interrupt the interlude to rob the victim while Coreas pretended to also be a victim.

At the time of the court's ruling in limine, the court indicated that based on the proffer in their motion, and assuming the People came forward with evidence of the conspiracy, the text messages would be admissible. At the close of the evidence, J.S. renewed the objection to the text messages, and the court overruled the objection. The court concluded the text messages were not hearsay at all, but instead were out-of-court statements used to show the subsequent actions of the victim. However, it also indicated that the statements were made by a coconspirator insofar as the statements made by Coreas in the *Perkins* operation showed the existence of the conspiracy. Both of these conclusions were proper.

The court did not abuse its discretion in admitting the evidence of the text messages or the videotaped *Perkins* operation.

4. ***Whether Substantial Evidence Supports the True Findings by the S.B. Court on Robbery, Burglary, and Two Counts of Aggravated Assault***

J.S. argues there is insufficient evidence to support the true findings made by the San Bernardino juvenile court because the evidence shows he aided and abetted, at most, shoplifting and the procurement of alcohol by a person under the age of 21. He also

46

argues that reversal is required because the juvenile court applied "the wrong legal framework to the questions before it."  J.S. is mistaken on both points.

    a.  *Substantial Evidence Supports the True Findings on All Counts*

J.S. argues there is insufficient evidence to support the findings on all four counts. However, he does not challenge the sufficiency of the evidence on any of the substantive counts.  Instead, he argues there is insufficient evidence that he aided and abetted the substantive counts, offering his own "framework" to show that "substantial evidence does not support a finding that J.S. aided and abetted a commercial burglary, robbery, or armed assault.  The most the evidence can establish is that J.S. aided and abetted shoplifting or the procurement of alcohol by persons less than 21 years old."  We disagree.

Principals include those who "aid and abet" in the "commission of a crime." (Pen. Code, § 31.)  " 'Aider and abettor liability is premised on the combined acts of all the principals, but on the aider and abettor's own mens rea.' " (*People v. Thompson* (2010) 49 Cal.4th 79, 116, citing *People v. McCoy* (2001) 25 Cal.4th 1111, 1120.) " '[O]nce it is proved that "the principal has caused an *actus reus*, the liability of each of the secondary parties should be assessed according to his own *mens rea*." ' " (*McCoy*, *supra*, at p. 1118.)

The words "aid" and "abet" have different meanings.  "The word 'aid' does not imply guilty knowledge or felonious intent, whereas the word 'abet' includes knowledge of the wrongful purpose of the perpetrator and counsel and encouragement in the crime." (*People v. Dole* (1898) 122 Cal. 486, 492; see *People v. Tewksbury* (1976) 15 Cal.3d 953, 960.)

For a person to be found guilty "under an aiding and abetting theory, someone other than the defendant must be proven to have attempted or committed a crime; i.e., absent proof of a predicate offense, conviction on an aiding and abetting theory cannot be sustained." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 (*Perez*).)

"Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*Perez, supra*, 35 Cal.4th at p. 1225, citing *McCoy, supra*, 25 Cal.4th at p. 1117.)

It is unnecessary for the People to prove a completed crime was committed in order to establish aider and abettor liability. "[P]roof of an attempt by a direct perpetrator is sufficient for purposes of aiding and abetting liability. If a direct perpetrator is thwarted and guilty only of an attempt, an aider and abettor may still be guilty of aiding and abetting the attempt." (*Perez, supra*, 35 Cal.4th at p. 1226, italics omitted.)

For purposes of aider and abettor liability, the commission of a robbery continues until all acts constituting the robbery have ceased. (*People v. Gomez* (2008) 43 Cal.4th 249, 256.) Because robbery (like burglary) is a specific intent crime, "the aider and abettor must ' "know the full[] extent of the perpetrator's criminal purpose and give[] aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." ' " (*In re K.M.* (2022) 75 Cal.App.5th 323, 327, quoting *People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

48

"[C]ircumstantial evidence and reasonable inferences may be sufficient to establish a defendant's guilt." (*In re K.M.*, *supra*, 75 Cal.App.5th at p. 328.) Factors for determining aiding and abetting of a robbery include presence at the scene of the crime, companionship, and conduct before and after the crime, including flight. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5; *People v. Haynes* (1998) 61 Cal.App.4th 1282, 1294; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094.) Although proof of only one of these factors, standing alone, may be insufficient to establish the defendant aided and abetted the commission of a charged offense (see *Campbell*, *supra*, at p. 409 [presence or prevention]; *People v. Abilez* (2007) 41 Cal.4th 472, 521 [flight]), in combination these factors can certainly constitute sufficient evidence to support such a finding.

On appeal, we examine the whole record in the light most favorable to the judgment below to determine whether it contains substantial evidence. (*People v. Johnson* (1980) 26 Cal.3d 557, 576-577; *In re Michael D.* (2002) 100 Cal.App.4th 115, 125-126.) Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. (*In re James D.* (1981) 116 Cal.App.3d 810, 813.) " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.] ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' " (*People v. Jones* (2013) 57 Cal.4th 899, 961.)

" 'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600, subd. (b).) However, '[a] reasonable inference … "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] … A finding of fact must be an inference drawn from evidence rather than … a mere speculation as to probabilities without evidence." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

The same standard of review applies to appellate review of the sufficiency of the evidence to support a finding in a juvenile proceeding that the minor violated a criminal statute. (*In re Roderick P.*, *supra*, 7 Cal.3d at p. 809; *In re R.W.* (2018) 24 Cal.App.5th 145, 148.)

b. *Analysis*

Reviewing the factors for determining aiding and abetting of a robbery, all are present in this case and support the findings by the juvenile court. J.S.'s presence, parked directly across from the scene of the crime, his companionship with the robbers, and, importantly, his conduct before and after the crime lead to the inescapable conclusion that J.S. was well aware the three perpetrators intended to rob the persons in the liquor store using the BB guns.

In arguing to the contrary, J.S. ignores the evidence of pre-robbery activity by which J.S. demonstrated his participation in the planning and execution of the robbery. J.S. and another person rented two motel rooms a few days before the robbery. There were BB guns found in both rooms; three were found in one room and in the other room

50

police found a fully automatic P1 BB gun, a bag of metallic BBs, a black hat, black pants, a black hoodie sweatshirt, and cell phones.

Video from the motel showing J.S. registering for the room depicts J.S. wearing the same satchel he was carrying at the time of his detention. From the totality of the evidence, and without any actual evidence to support a contrary inference, it was reasonable for the juvenile court to infer that J.S. was aware that the robbery would involve force to take the property and asport it.

After the robbery, J.S. was carrying the satchel which contained far more cash than was taken in the liquor store robbery. In arguing that the record shows he intended no more than to aid and abet a simple beer run J.S. ignores these facts, and disregards the well-established standard of review which requires us to examine the whole record in the light most favorable to the judgment below and to avoid speculation.

J.S. also ignores all the evidence of his actions during the robbery of the liquor store, and the reasonable inferences the juvenile court could draw from the totality of the evidence. Rather than considering bits of evidence in isolation, as suggested by J.S., we review the entire record to determine if J.S. had the requisite mental state or knowledge to be liable for aiding and abetting an armed robbery.

The juvenile court made detailed findings. It concluded J.S. was involved in the entire operation, having been the driver of the vehicle before the robbery, during the robbery, and after the robbery. The court also found that the robbery was part of a plan, and that as part of the plan, J.S.'s co-participants would enter the store and would commit an armed robbery and take property of the persons inside of the store by force and

51

through the use of BB guns. The court found that J.S. was aware of the plan beyond a reasonable doubt based on the fact that all of J.S.'s coparticipants had BB guns, and that J.S. was involved in the plan and involved in the robbery, because he drove the co-participants to the liquor store, where, instead of parking in the lighted parking lot, he drove to a more covert location and drove his coparticipants to an area of the parking lot that was dimly lit. J.S. then dropped them off in the dark.

The court explained that during the robbery, instead of parking in the lighted parking lot, J.S. drove to a more covert location and drove his coparticipants to an area of the parking lot that was dimly lit. He then dropped them off in the dark. Instead of parking his vehicle in front of the liquor store, he drove his vehicle across the street from the liquor store. J.S. turned his car to face the liquor store, and then he turned off his lights and waited.

The juvenile court went on to explain that after the robbery was committed, and the co-participants ran from the store, J.S. followed them, picked them up, and then drove them back to the motel that he rented. The court concluded that based on J.S.'s conduct, which evidenced his awareness of the plan, it would be unreasonable to conclude that J.S. did not know that his co-participants were going to enter the liquor store and commit the robberies with the BB guns.

Further, because all the participants had BB guns, which were used as soon as they entered the store to commit the robbery, the court rejected the suggestion they were there to take beer, to take gum, or to take something else. Finally, the court found it was

52

foreseeable there would be a customer inside of the store, making the assaults foreseeable.

In addition to finding that J.S. knew of the robbery plan because the three actual perpetrators all had BB guns, the record shows that there was a fourth gun found in J.S.'s room after the robbery. Thus, the three perpetrators were not the only persons to have a BB gun. As for J.S.'s argument that "we cannot even be entirely sure J.S. was the driver," the fact the car was registered to the address J.S. provided at the time of his booking, along with the fact J.S. was driving the vehicle at the time of the traffic stop, support the court's conclusion as a reasonable inference. The fact other inferences might be drawn is irrelevant. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*People v. Bean* (1988) 46 Cal.3d 919, 933; see *People v. Thomas* (2023) 14 Cal.5th 327, 377-378.)

The court's findings are reasonable and are supported by the record, whereas J.S.'s "framework" was supported by mere conjecture and speculation. Because there is substantial evidence in the record, read as a whole, to support the court's inferences and conclusions, the true findings are supported by substantial evidence.

c. *Whether the Juvenile Court Applied the Wrong Legal Framework Is Irrelevant*

J.S. criticizes the court's conclusions from the evidence by arguing that the court applied the "wrong legal framework to the questions before it." J.S. also cites inapposite authority in an attempt to inject the minor's age into the sufficiency of the evidence

53

equation.  One of the authorities cited (*J.D.B. v. North Carolina* (2011) 564 U.S. 261, 274) is wholly inapposite, where the issue involved was whether a juvenile made a voluntary statement to police in custodial interrogation, involving a question of voluntariness to which a minor's age has relevance, and did not involve a sufficiency of the evidence claim.  Such arguments are not persuasive, given that J.S. was adjudicated as a juvenile where his age was already taken into account.

As for the framework used by the court to reach its conclusions, the court's reasoning is irrelevant to the outcome where we review the rulings and not the reasoning employed by the lower court.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1152, citing *People v. Mickey* (1991) 54 Cal.3d 612, 655-656.)

We therefore do not need to address J.S.'s discussion about what is known or not known about the intentions on the part of the three direct perpetrators because the evidence of what they did provided the juvenile court with circumstantial evidence of their intent:  In a highly coordinated action, the three perpetrators, dressed in dark clothing, wearing ski masks and armed with BB guns, entered the liquor store to rob.  There is nothing in the record to support an inference they intended to commit any crime other than robbery short of sheer speculation.

J.S. also incorrectly argues that the true findings are based on "conjecture" and that there is no "credible evidence that he had *knowledge* of weapons, and *knowledge* that the weapons were on the three individual's person at the time he is said to have given them a ride to (or simply agreed to pick up the individuals from) the store, we cannot just assume J.S. knew of a plan to use force, much less of a plan to use force to steal property

or a plan to use felony level force." This statement ignores the fact that we do not reevaluate credibility determinations made by the lower court (*People v. Lindberg* (2008) 45 Cal.4th 1, 27, and cases there cited), and the juvenile court was permitted to make reasonable inferences from the evidence before it. In fact, where the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Valdez* (2004) 32 Cal.4th 73, 104.) Further, the statement ignores the fact that BB guns were found in both motel rooms, one of which was occupied by J.S.

Because J.S.'s arguments focus primarily on other alternative interpretations of evidence which are unsupported by the record as a whole, we do not need to address the remaining contentions. It is irrelevant that other inferences may have been possible; what is relevant is whether the inferences were *reasonable*. None of the various theses advanced by J.S. as possible states of mind or knowledge on his part are persuasive given the total lack of evidence in the record to support them, and the entirety of the evidence supporting the juvenile court's findings. On appeal, we examine the entire record to determine if the inferences drawn by the juvenile court were reasonable, not whether other inferences were possible.

This means that any notion that J.S. may have thought his companions were doing a beer run or a shoplift is quickly eliminated by a review of the extremely short duration of the robbery which came away with cash and no beer. And his arguments, without legal citations, that "J.S.'s knowledge and intent must be considered from his vantage point, prior to the incident," is contrary to the standards of appellate review.

55

This is also true of J.S.'s assertions there is no "credible evidence that he had knowledge of weapons," or that "we cannot just assume J.S. knew of a plan to use force, much less of a plan to use force to steal property or a plan to use felony level force." But because a robbery is a continuing crime which is not completed until the robbers reach a place of temporary safety, J.S.'s assistance in the escape, even without his pre-robbery conduct, made him liable for participation in the robbery. (*People v. Cooper* (1991) 53 Cal.3d 1158, 1167.) Nevertheless, there is ample circumstantial evidence to support findings of his knowledge and intent.

The same can be said about the foreseeability of the use of force. There were four BB guns found in the motel room search, one of which was in J.S.'s room. As one of the persons who rented the rooms, his possession of a BB gun leads to a reasonable inference he had knowledge of the guns and was aware they would be used, particularly where the amount of cash found in his possession upon arrest strongly suggests other criminal plans. As an aider and abettor, and possibly a coconspirator, J.S. may be liable not only for the offense he intended to encourage or facilitate, but also for any reasonably foreseeable offense committed by the perpetrator he aids and abets. (*People v. Avila* (2006) 38 Cal.4th 491, 564.) Taking BB guns into a liquor store, where the guns are displayed, constitutes the use of force to steal property, and the mere fact that one intends to rob using a BB gun makes the use of force reasonably foreseeable. Absent evidence to the contrary, the circumstantial evidence constitutes substantial evidence.

The record also does not support J.S.'s claim that the juvenile court applied the "wrong legal framework to the questions before it." Substantial evidence review does not

consider either the court's "framework" or that of J.S. Instead, the court applied the correct law under the correct standard. We do not review the framework of a trial court's rulings; we review the rulings themselves to determine if there is error, or if there is substantial evidence to support them based on the evidence from the entire record.

Nor do we find persuasive J.S.'s argument that the juvenile court "conflated the direct perpetrator's knowledge/intent with that the aider and abettor and/or erroneously shifted the burden of proof onto [J.S.] to prove his innocence, with respect to the same." Again, the court's findings were supported by circumstantial evidence that J.S. shared in the intent of the direct perpetrators to commit and benefit from the robbery, and that he directly aided and abetted the perpetrators.

The findings are supported by substantial evidence.

5. ***Review of the Sealed Transcript of Trial Court's Pitchess Hearing***

In the juvenile court, J.S. filed a motion for discovery of complaints against various law enforcement officers, seeking, in particular, *Brady* (referring to *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*)) material. The juvenile court conducted an in camera hearing, found that certain files contained discoverable material, issued a protective order regarding the confidential material and ordered that the discoverable information be transmitted to the minor's counsel.

On appeal, J.S. requests that we independently review the sealed record of the trial court discovery rulings pursuant to *Pitchess*, *supra*, 11 Cal.3d 531, in order to determine whether the trial court's in camera review process complied with the law. The People are unopposed. Although we were required to augment the record to include review of the in

57

camera proceedings related to the first two officers, we obtained the additional records, reviewed all of the in camera proceedings, and we now conclude that the trial court did not abuse its discretion.

a. *General Principles Governing Pitchess Procedures*

As a general rule, the personnel records of peace officers and custodial officers and records maintained by a state or local agency pursuant to Penal Code section 832.5, or information obtained from these records, are confidential, and may not be disclosed in any criminal or civil proceeding except by discovery pursuant to Evidence Code sections 1043 and 1046. (Pen. Code, § 832.7, subd. (a).) Evidence Code section 1045, subdivision (a), provides that the privilege does not affect the right of access to records of complaints, or investigations of complaints, or discipline of a peace officer, where information is relevant to the subject matter involved in the pending litigation.

Under the holding of *Pitchess*, an accused in a criminal prosecution may compel discovery such otherwise privileged information by "demonstrating that the requested information will facilitate the ascertainment of the facts and a fair trial." (*Pitchess*, *supra*, 11 Cal.3d 531, 536.) Under *Brady*, *supra*, 373 U.S. 83, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence, and this duty extends to evidence known to others acting on the prosecution's behalf, including the police. (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709.) The procedural mechanism for criminal defense discovery, considered in light of the prosecution's constitutional obligation to disclose to a defendant material exculpatory evidence so as not to infringe the defendant's right to a fair trial, is

an established part of criminal procedure in this state. (*Id*. at p. 712, citing *People v. Mooc* (2001) 26 Cal.4th 1216,1225-1226 (*Mooc*).)

"The requisite showing may be satisfied by general allegations which establish some cause for discovery other than 'a mere desire for the benefit of all information which has been obtained by the People in their investigation of the crime.' " (*Pitchess*, *supra*, 11 Cal.3d at p. 537.)

"If the trial court concludes the defendant has fulfilled these prerequisites and made a showing of good cause, the custodian of records should bring to court all documents 'potentially relevant' to the defendant's motion." (*Mooc*, *supra*, 26 Cal.4th at p. 1226.) The trial court must then examine the records in camera to determine if any information should be disclosed. (*People v. Winbush* (2017) 2 Cal.5th 402, 424, citing *Mooc*, at p. 1226.) Subject to certain statutory exceptions and limitations, "the trial court should then disclose to the defendant 'such information [that] is relevant to the subject matter involved in the pending litigation.' " (*Mooc,* at p. 1226.) "The trial court should then make a record of what documents it examined before ruling on the *Pitchess* motion," to facilitate future appellate review. (*Id.* at p. 1229.) "*Pitchess* rulings are reviewed for abuse of discretion." (*Winbush*, *supra,* at p. 424, citing *People v. Jackson* (1996) 13 Cal.4th 1164, 1220.)

b. *Analysis*

In the present case, the custodian of records searched all available databases for files relating to complaints against certain named law enforcement officers and stated under oath that he had brought all of them to the L.A. Court pursuant to the *Pitchess*

motion. After carefully reviewing each file related to each officer named in the motion, the juvenile court concluded that some files contained discoverable information and directed the transmittal of the discoverable information to minor's counsel.

The trial court made a detailed record of all the materials it had reviewed and what it found discoverable. Our review confirms that all discoverable materials were properly released. There being no *Pitchess* error, there is no abuse of discretion.

## 6. *Dispositional Issues: Aggregated and Consecutive Terms for the San Bernardino Offenses and Restitution Fine*

J.S. argues that a new dispositional hearing is required because the juvenile court incorrectly set the baseline term for his commitment period by imposing consecutive terms for the San Bernardino counts. J.S. also seeks remand to reconsider the restitution fine due to recent legislative changes. The People agree that remand is needed, as do we.

### a. *Aggregation of Determinate and Indeterminate Terms*

The first problem with the disposition was in the manner in which the term for the murder finding and the term for the robbery related counts were aggregated. As in criminal cases, when a defendant is sentenced to both a determinate and an indeterminate sentence, the determinate sentence is served first. (*People v. Reyes* (1989) 212 Cal.App.3d 852, 856.) Thereafter, the court must determine if the multiple terms imposed in the San Bernardino liquor store robbery constitute improper multiple punishment.

Section 875 "governs the commitment of juvenile wards to the SYTF that have replaced the Division of Juvenile Justice as the most restrictive placement alternative."

60

(*In re Tony R.* (2023) 98 Cal.App.5th 395, 406; Cal. Rules of Court, rule 5.804.)  Pursuant to section 875, the juvenile court must set a maximum term of confinement which represents the longest term of confinement the ward may serve in a facility.  (§ 875, subd. (c)(1).)  The maximum term of confinement must not exceed the middle term of imprisonment that can be imposed upon an adult convicted of the same offense or offenses and if the court elects to aggregate the term of confinement on multiple petitions, the maximum term shall be the aggregate term of imprisonment specified in subdivision (a) of Penal Code section 1170.1.  (§ 875, subds. (c)(1)(A) & (c)(1)(B).)

Penal Code section 1170.1 governs the protocol for calculating an aggregate determinate sentence.  "First, the trial court is required to select a base term—either the statutory low, middle or upper term—for each of the crimes.  (Pen. Code, § 1170; Cal. Rules of Court, rule 4.405(2).)  Second, if the court determines that a consecutive sentence is merited, it must designate the crime with the 'greatest' selected base term as the principal term and the other crimes as subordinate terms.  (Pen. Code, § 1170.1, subd. (a).)  Third, the court sentences the defendant to the full base term it selected for the principal term crime and one-third of the middle term for any crimes for which the sentence is ordered to run consecutively."  (*People v. Neely* (2009) 176 Cal.App.4th 787, 798; *People v. Felix* (2000) 22 Cal.4th 651, 655 (*Felix*).)  A subordinate term is one-third of the middle term even if the trial court had initially selected the lower or upper term as the base term.  (*Felix*, *supra*, at p. 655.)

Thus, the court was required to select a principal term for the robbery and impose one-third the middle term for the remaining subordinate determinate terms.  (See *People*

61

*v. Reyes*, *supra*, 212 Cal.App.3d at p. 856; Pen. Code, § 1170.1.)  "Life sentences, whether with or without the possibility of parole, may be imposed to run consecutively with one another, with any term imposed for applicable enhancements, or with any other term of imprisonment for a felony conviction."  (Pen. Code, § 669, subd. (a); *Felix*, *supra*, 22 Cal.4th at p. 655.)

A new disposition hearing is required to calculate the determinate term and order the indeterminate term to run consecutive to the determinate term.

b.  *Multiple Punishment Under Penal Code Section 654*

The next issue with the disposition order deals with whether the court improperly imposed consecutive terms in the S.B. Court case where all four counts arose from a single object:  the robbery of the liquor store.

Penal Code section 654, subdivision (a), provides:  " 'An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.' "  (*People v. Corpening* (2016) 2 Cal.5th 307, 311.)  " 'Th[is] section applies to juvenile court proceedings.' "  (*In re L.J.* (2021) 72 Cal.App.5th 37, 43.)

" ' "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of [Penal Code] section 654 depends on the intent and objective of the actor.  … [¶] Whether the facts and circumstances reveal a single intent and objective within the meaning of Penal Code section 654 is generally a factual

matter; the dimension and meaning of [Penal Code] section 654 is a legal question." ' "
(*In re L.J., supra*, 72 Cal.App.5th at p. 43.)

Burglary consists of entry into a house or other specified structure with the intent to commit a felony. (Pen. Code, § 459.) Ordinarily, if a defendant commits both burglary and the underlying intended felony, Penal Code section 654 will permit punishment for one or the other but not for both. (*People v. Centers* (1999) 73 Cal.App.4th 84, 98-99 (*Centers*), citing, among other authorities, *People v. James* (1977) 19 Cal.3d 99, 119-120 [burglary and intended robbery].) However, Penal Code section 654 does not prohibit multiple punishments where the defendant's single objective during an indivisible course of conduct results in crimes of violence against multiple victims. (*People v. Deloza* (1998) 18 Cal.4th 585, 592, citing *People v. Miller* (1977) 18 Cal.3d 873, 885 (*Miller*), overruled on other grounds as stated in *People v. Oates* (2004) 32 Cal.4th 1048, 1067, fn. 8; see *People v. Cardenas* (2015) 239 Cal.App.4th 220, 230.)

An exception is created, however, where the single criminal transaction involves multiple victims. (*Miller*, *supra*, 18 Cal.3d at p. 885; see *People v. Correa* (2012) 54 Cal.4th 331, 341 (*Correa*) [Pen. Code, § 654 does not apply to crimes of violence against multiple victims].) "When a defendant engages in violent conduct that injures several persons, he may be separately punished for injuring each of those persons, notwithstanding [Penal Code] section 654. (*Neal v. State of California* (1960) 55 Cal.2d 11, 20-21 (*Neal*).) Robbery is violent conduct warranting separate punishment for the injury inflicted on each robbery victim. As we explained in [*Miller*, *supra*,18 Cal.3d at p. 886]: 'The robbery of a victim at gunpoint has been held to be an act of violence such

as to preclude application of [Penal Code] section 654 in the case of multiple convictions involving multiple victims.' " (*People v. Champion* (1995) 9 Cal.4th 879, 934-935.)

For this reason, the crime of burglary may also be treated as a crime of violence when the defendant personally used a firearm in committing the offense. (*Centers*, *supra*, 73 Cal.App.4th at p. 99.) To preclude application of Penal Code section 654, however, each of the crimes must have involved at least one different victim. (*Centers*, at p. 102; *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1784-1785.)

Regarding the customer who was assaulted in the course of the robbery, other considerations come into play. Where the assault is the means of committing the robbery and was merely incidental to the primary object of robbing the victim, the defendant cannot be punished for the more serious offense of robbery. (*People v. Medina* (1972) 26 Cal.App.3d 809, 824, citing, among other authority, *Neal*, *supra*, 55 Cal.2d at pp. 19-20, disapproved on a different point in *Correa*, *supra*, 54 Cal.4th at p. 334 [disapproving dicta found in footnote 1 at page 18 of *Neal*].)

J.S. asserts that his only act was driving, and that his commitment must be limited to a single term for a single act. This assertion reflects a misunderstanding of liability for aiding and abetting and the principles underlying Penal Code section 654, particularly as it applies to aiders and abettors.

Under Penal Code section 31, an aider and abettor is a principal, "has the same culpability and suffers the same punishment as the perpetrator[s] who directly commits the crime. 'This doctrine snares all who intentionally contribute to the accomplishment of a crime in the net of criminal liability defined by the crime, even though the actor does

64

not personally engage in all of the elements of the crime.' " (*In re Meagan R.* (1996) 42 Cal.App.4th 17, 23 (*Meagan R.*).)

J.S.'s reliance on *Meagan R.* as authority for the general (and incorrect) proposition that J.S. can only be punished for his single act of driving reflects a misinterpretation of the holding of the case. In *Meagan R.*, the juvenile defendant was found to have committed burglary, where the specific intent identified in the charging document described the burglary as for the purpose of aiding and abetting her own statutory rape. Because of legal impossibility of a person aiding and abetting their own statutory rape, the reviewing court vacated the burglary finding. (*Meagan R.*, *supra*, 42 Cal.App.4th at pp. 24-25) This did not involve application of Penal Code section 654 principles.

The People argue that the robbery count and burglary count are part of the same course of conduct committed with the same objective to steal money, and the full term for the burglary should have been imposed and stayed. We note, however, that the burglary count alleges that the entry into the liquor store was for the purpose of larceny, not robbery. If the larceny language subsumes robbery, then this result may be required. However, this determination will be up to the juvenile court.

And respecting the robbery, we note that although a single robbery was charged, two separate counts could have been alleged, given that both the store clerk and the customer were separate victims of the robbery, each a separate act of violence. Ordinarily, a person cannot be punished for both the robbery and the assault with which the robbery was accomplished, unless the violence is gratuitous and evidences an

independent objective. (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 191; *People v. Mitchell* (2016) 4 Cal.App.5th 349, 352-353.) However, "gratuitous violence against a helpless and unresisting victim … has traditionally been viewed as not 'incidental' to robbery for purposes of Penal Code section 654" (*Nguyen*, *supra*, at p. 190), and may warrant separate punishment. (*People v. Ibarra* (2024) 106 Cal.App.5th 1070, 1083.)

Here, the wardship petition alleged that J.S. committed robbery against Marco P., the customer, who was robbed and struck in the head by one of the robbers. As to the robbery count, separate punishment for the aggravated assault constitutes double punishment for the same criminal act, unless the court determines that the violence accompanying the robbery was gratuitous, evidencing an independent objective. As to Noaman, the store clerk, however, a separate victim of violence, a term for the aggravated assault is proper because no robbery was charged in which he was named as a victim.

We do not intend by our analysis to limit the juvenile court's discretionary decisions on remand. Instead, we intend only to provide a foundation or framework for the exercise of discretion on remand the juvenile court must determine which of the two crimes should form the basis for the term of commitment, and which of the two should be stayed.

c. *Remand Is Required to Reconsider the Restitution Fund Fine In Light of Recent Legislative Changes to the Welfare and Institutions Code*

J.S. argues that he is entitled to a new disposition hearing because the Legislature has repealed statutory provisions governing imposition of restitution fines and orders for restitution to victims. We agree J.S. is entitled to the benefit of the amended statute.

66

At the disposition hearing, the juvenile court imposed a $100 restitution fund fine for both cases, at his dispositional hearing on October 30, 2023.  The juvenile court also ordered J.S. to pay victim restitution to the father of the murder victim, in amounts to be determined at a restitution hearing; the court reserved jurisdiction on that issue, which was set for a hearing on December 5, 2023.  At the time of the disposition hearing, section 730.6, subdivision (a)(2)(A), directed juvenile courts to impose a restitution fund fine on juvenile offenders.  (Stats. 2015, ch. 131, § 1.)  Under former subdivision (b)(1) of section 730.6, the minimum restitution fine for a minor found responsible for a felony was $100.  (*Ibid.*)

Effective January 1, 2025, section 730.6 currently provides, in pertinent part, "The court shall not impose a separate and additional restitution fine against a minor found to be a person described in Section 602."  Additionally, the amended legislation provides, "For the purposes of victim restitution, each minor shall be held severally liable and shall not be held jointly and severally liable as co-offenders.  The court shall apportion liability based on each minor's percentage of responsibility or fault for all economic losses included in the order of restitution.  The aggregate amount of apportioned liability for all minors involved shall not exceed 100 percent in total."  (§ 730.6, subds. (a)(2) & (b)(3); see Stats. 2024, ch. 805, § 6 [Assem. Bill No. 1186 (2023–2024 Reg. Sess.)].)

As to the victim restitution portion of J.S.'s claim, that issue is not properly before us because the issue of victim restitution was set for a separate hearing after the disposition hearing, we have no record of that proceeding, and J.S. did not separately appeal following the restitution hearing.  That issue has been forfeited.  (See *In re*

67

*Julian O.* (1994) 27 Cal.App.4th 847, 852 ["If and when a restitution order is actually entered by the juvenile court, appellant may challenge that order by filing a timely appeal therefrom. Appellant may not challenge that order in this appeal because that order is not a part of the judgment from which he is currently appealing"].)

Respecting the restitution fine, the juvenile court imposed a separate $100 restitution fine for each case. At the time of J.C.'s disposition, the restitution fine was mandatory. (Former § 730.6, subd. (a)(2)(A), (b)(1); Stats. 2015, ch. 131, § 1.) However, effective January 1, 2025, the Legislature passed Assembly Bill No. 1186 (2023–2024 Reg. Sess.), which amended section 730.6 to prohibit a court from "impos[ing] a separate and additional restitution fine against a minor found to be a person described in Section 602." (§ 730.6, subd. (a)(2), as amended by Stats. 2024, ch. 805, § 6.)

An adult or juvenile offender is generally entitled to benefit from amendments that become effective while their case is on appeal and not yet final. (*People v. Vieira* (2005) 35 Cal.4th 264, 305 [applying a revised version of the statute in setting a restitution fine]; *In re N.D.* (2008) 167 Cal.App.4th 885, 891 [rule of retroactivity applies to juvenile delinquency judgments].) "[W]here the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." (*In re Estrada* (1965) 63 Cal.2d 740, 748.) Because imposing a restitution fine constitutes "punishment," we conclude section 730.6 operates retroactively and precludes imposition of a restitution fine here. (*People v. Allen* (2019) 41 Cal.App.5th 312, 321.)

Therefore, on remand, the $100 restitution fine for each case should be stricken.

**DISPOSITION**

The adjudicatory findings and disposition relating to the murder charge from the Los Angeles County Juvenile Court are reversed. The matter is remanded for further adjudicatory proceedings by the Los Angeles County Juvenile Court. Upon the conclusion of the adjudicatory proceedings in the Los Angeles County, the matter shall be retransferred to the San Bernardino Juvenile Court for further proceedings as to disposition.

The adjudicatory findings on the robbery and assault petition of the San Bernardino Juvenile Court are affirmed, but the disposition is reversed. Upon conclusion of the re-adjudication of the Los Angeles matter and retransfer of the matter to the San Bernardino Juvenile Court, the San Bernadino Juvenile Court shall also conduct further dispositional proceedings relating to the San Bernardino Juvenile Court matter for recalculation of the aggregate terms and for reconsideration of the imposition of the restitution fund fine based on recent statutory amendments.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

MILLER
J.
CODRINGTON
J.

69